**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------

ANWAR ALKHATIB,
                   Plaintiff,

v.

NEW YORK MOTOR GROUP LLC,
CAPITAL ONE AUTO FINANCE, INC.,
PLANET MOTOR CARS, INC.,
MAMDOH ELTOUBY,
NADA ELTOUBY, and
JULIO ESTRADA a/k/a "John" a/k/a "John Santos"
a/k/a "Jay Santos" a/k/a "John Dos Santos" a/k/a "John Figueroa"
a/k/a "Jay Torres",

                   Defendants.

---------------------------------------------------------------

**FIRST AMENDED COMPLAINT**

**AND JURY DEMAND**

**13-CV-2337(ARR)(SMG)**

## INTRODUCTION

1.      This is an action for money damages, injunctive relief, and declaratory judgment, brought by an individual consumer seeking redress for unlawful practices relating to an automobile transaction and setting forth Defendants' violations of the Truth In Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA"), The Racketeering Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961, et seq., New York Motor Vehicle Retail Installment Sales Act, Personal Property Law ("MVRISA") § 302, et seq.; New York General Business Law §§ 349 and 350, New York State Usury Law, and setting forth common law claims for Fraud, Breach of Contract, Rescission/Mistake, and Negligent Hiring Retention and Training.

2.      Plaintiff Anwar Alkhatib brings suit on an individual basis as part of a series of related cases stemming from the unfair, abusive and fraudulent practices employed by New York Motor Group and Planet Motor Cars, Inc (collectively "the Dealerships" or "the Dealership") and their

1

owners and employees in their attempt to sell an automobile to Plaintiff beginning on December 18, 2012.

3.     Upon information and belief, the Dealership Defendants' finance manager is Julio Estrada who has been preying on consumers for several years while working as the finance manager for various auto dealerships.

4.     On December 3, 2012, Mr. Estrada was arrested and indicted by a Queens County Grand Jury on multiple counts of theft, larceny, forgery and fraud related to his alleged actions while working as the finance manager for Auto Palace, Inc.

5.     On December 4, 2012 The Queens County District Attorney announced the indictment in a press release that identified Mr. Estrada as having defrauded over 23 consumers out of more than $115,000 with the promise that they could return to him to refinance their high rate loans after six months of on-time payments and thereby receive better rates and lower their monthly payment by hundreds of dollars.

6.     Within weeks of that indictment and arrest, Mr. Estrada was working for the Defendant Dealerships here managing their financing procedures in the sale of automobiles.

7.     Mr. Estrada has since been sentenced in Queens County Supreme Court - Criminal Term to 5-years' probation and restitution of over $118,000 after pleading guilty to various charges in the People v. Julio Estrada, Docket No. 02842-2012.

8.     Upon information and belief, Julio Estrada was re-arrested in April 2013 and charged with forgery and larceny in Nassau County related to a similar scam he was running at another auto dealership in that county involving false promises of fixing consumers credit scores in exchange for cash payments.

9.      On information and belief the Dealerships' Principal and Owner, Defendant Mamdoh Eltouby, was aware of or should have been aware of Mr. Estrada's arrests, indictments, convictions and sentencing during all relevant times described herein.

10.     Upon information and belief, Mr. Estrada worked closely with Mamdoh Eltouby's daughter, Nada Eltouby, while overseeing the financing procedures for the Dealership during all relevant times herein; and Ms. Eltouby knowingly assisted Mr. Estrada in placing consumers in loan obligations that resulted in thousands of dollars of unfair, deceptive, illegal and fraudulently induced overcharges as happened to Plaintiff here.

11.     Upon information and belief, Mr. Estrada has used several aliases while working for the Dealerships including "John," "Jay," "John Dos Santos," "Jay Santos," and "John Figueroa."

12.     At all relevant times described in the complaint, Mr. Estrada was known to the Plaintiff only by the alias "John Figueroa."

13.     Upon information and belief, in his role as Finance Manager for the Dealerships, Mr. Estrada has continued to prey on consumers in attempts to unfairly, illegally, and fraudulently increase the costs of transactions to consumers for the benefit of all Defendants.

14.     As will be described in full detail below, this is precisely what occurred to Plaintiff in his dealings with the Dealerships.

## JURISDICTION AND VENUE

15.     Jurisdiction is based on 15 U.S.C. § 1640 and 28 U.S.C. § 1337.

16.     The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201 and § 2202.

17.     This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is proper under 28 U.S.C § 1391 because a substantial part of the events and omissions complained of took place in this District and Defendants maintain offices, transact business, and are otherwise found in this district.

## THE PARTIES

19.     Plaintiff Anwar Alkhatib is a resident of Bergen County, New Jersey.

20.     Defendant NY Motor Group LLC ("NYMG" or "Dealership") is a domestic limited liability company under the laws of New York, whose principal place of business is located in Woodside, New York in Queens County.

21.     Defendant Planet Motor Cars, Inc. ("Planet Motor Cars") is a corporation incorporated under the laws of New York, whose principal place of business is located in Jamaica, New York in Queens County.

22.     Defendant Mamdoh Eltouby is the owner of NYMG and, upon information and belief, is the owner or has an ownership interest in Planet Motor Cars.

23.     Mr. Eltouby's principal place of business is at New York Motor Group in Queens County.

24.     Mr. Eltouby currently determines the policies and procedures of NYMG and Planet Motor Cars and makes decisions to hire, train and retain employees, in particular the finance manager for the Dealerships.

25.     At the time of Plaintiff's transaction, Mamdoh Eltouby was the primary decision maker and the person who managed the day-to-day operations of NYMG and Planet Motor Cars.

26.     Mamdoh Eltouby is the primary decision maker and the person who manages the day-to-day operations of NYMG and Planet Motor Cars.

4

27.     On information and belief, NYMG and Planet Motor Cars are united in interest in the same business venture, such that separate business entities do not exist and/or are irrelevant to liability under TILA, NYGBL, MVRISA, RICO, NYGOL § 5-501, and laws of New York as alleged herein and each entity will be collectively and interchangeably referred to hereafter as "the Dealership" or "the Dealerships" or "Dealership Defendants."

28.     Defendant Nada Eltouby is Mamdoh Eltouby's daughter and is employed by the Dealership where she assists with the sale and financing of vehicle purchases.

29.     Ms. Eltouby's business address is at NYMG.

30.     Julio Estrada is an employee of the Dealership whose primary responsibility is management of the Dealership's financing process.

31.     Julio Estrada's business address is at NYMG.

32.     Defendant Capital One Auto Finance, Inc. ("COAF") is a corporation incorporated under the laws of the Commonwealth of Virginia, whose principal place of business is located in McLean, Virginia.

33.     COAF is the assignee of a Retail Installment Contract between Plaintiff and NYMG, and therefore, is liable for all claims asserted against the Dealership under State and Federal law.

## FACTS

34.     In December 2012, Plaintiff saw an advertisement on cars.com for a 2008 Honda Odyssey mini-van. ("the vehicle").  The advertisement offered the vehicle for sale for approximately $14,995.

35.     On or about December 18, 2012, Plaintiff went to the Dealership and inquired about purchasing the vehicle.

36.     Although the vehicle was advertised on cars.com for $14,995, the window sticker on the vehicle at the Dealership showed $16,995 as the sale price.

37.     After negotiating with Alex, a Dealership salesperson, Plaintiff agreed to purchase the vehicle for the online advertised price of $14,995, and the Dealership agreed to sell it to him for that price.

38.     Plaintiff then explained to the salesperson that he wanted to put down $10,000 cash and finance the remaining $4,995 of the sale price.

39.     Upon hearing about such a large downpayment, Alex agreed to further reduce the sale price by $1,000, making the final agreed upon price $13,995.

40.     Thereafter, Alex prepared a purchase invoice listing the sale price at $13,995.

41.     Alex then told Plaintiff that he would have to return the next day to complete the transaction because it was 7:00pm and too late to finish the finance process.

42.     The Dealership asked Plaintiff, however, to leave a $200 deposit to keep the deal open while they worked on the financing.

43.     The Dealership refused to provide Plaintiff with a receipt for the $200 deposit, though Plaintiff requested one.

44.     After some prodding from Plaintiff, the Dealership did provide a photocopy of a portion of a service invoice that reflected the $200 deposit.

45.     On December 19, 2012, Plaintiff returned to the Dealership with $9,800 cash to complete the transaction.

46.     Alex informed Plaintiff on that day that Plaintiff had to turn over all $9,800 before any loan application would be made on his behalf.

47.    Mr. Alkhatib turned over the $9,800 cash and received a dealership receipt for the payment.

48.    The Dealership then left Plaintiff to wait for approximately two hours before he was introduced to the finance representative of the dealership.

49.    The finance representative introduced himself to Plaintiff as "John Figueroa."

50.    Upon information and belief, "John Figueroa" is actually Julio Estrada.

51.    "John Figueroa" then informed Mr. Alkhatib that he had been turned down for credit by two banks, Chase and TD Bank, due to Plaintiff's poor credit rating.

52.    Plaintiff was surprised to hear this, as he had never signed any loan application at that point.

53.    Plaintiff immediately requested copies of the letters declining him credit, but "John Figueroa" refused to provide any documents and instead promised that the banks would mail them directly to Plaintiff.

54.    To date, Plaintiff has never received any letter from Chase or TD Bank declining his credit application.

55.    The Dealership finance representative, "John Figueroa" then told Plaintiff that due to his bad credit he would have to accept one of the two following options for financing the vehicle:

      i.   Option 1 required an additional $4,500 processing fee, 15% APR, and a prepayment penalty for pay offs within the first 18 months.

     ii.   Option 2 required an additional $1,750 processing fee, $2,700 for insurance purchased through the dealership, $3,000 for a service contract, and 10% APR.

56.     Faced with two options that would drastically increase the cost of purchasing and financing the vehicle, Mr. Alkhatib indicated that he did not want to finance the vehicle and asked for his deposit back.

57.     At that time the Dealership, through "John Figueroa", informed Mr. Alkhatib, for the first time, that as the financing process had already started, they could not cancel it without Plaintiff incurring a penalty of 35% of the cash price.

58.     "John Figueroa" also informed Mr. Alkhatib at that point that if he did cancel, the dealership would keep his entire $10,000 deposit, while Plaintiff would have to wait for a "collection company" to send him a refund after the 35% was taken.

59.     Shocked by such an outrageous set of "options," Mr. Alkhatib then offered to pay cash for the full sale price of $13,995.

60.     The Dealership, through "John Figueroa", however, then informed Plaintiff that it was no longer possible to enter into an entirely-cash transaction and that if he wished to purchase the car at all, Plaintiff had to continue with financing through the dealership's "options."

61.     At that point, it was after 7:00pm on a December evening and Mr. Alkhatib, a resident of Bergen County, NJ, was alone without a car in Woodside, Queens.

62.     After being told that if he left without consummating a deal, he would forfeit nearly half of his $10,000 deposit without any guarantee of receiving the remainder, Plaintiff reluctantly agreed to go forward with "Option 2," which required additional charges of over $7,450.

63.     "John Figueroa" described all of these additional charges as "security conditions" required to obtain the loan.

8

64.     Thereafter, "John Figueroa" prepared a retail installment contract (RIC) and purchase agreement that failed to itemize these additional charges and merely inflated the agreed upon vehicle price to $21,457.50.

65.     The loan and purchase documents also show additional charges of $350 for what are described as "Government Certificate of Title Fees."

66.     The RIC indicates that the amount financed is $13,309.53, the finance charge is $4,034.67 and the APR is 10.76%.

67.     The RIC indicates that Mr. Alkhatib will have to make total payments of $17,344.20, after putting down $10,000.

68.     In sum, the RIC indicates that Plaintiff will have paid over $27,000 to purchase a used car advertised for $14,995.

69.     The Service Contract and "Insurance" Agreement of "Option 2" were given to Plaintiff separately.

70.     The "Insurance" was in actuality a "Theft Deterrent Product Protection," policy, which explicitly disclaimed "THIS PRODUCT DOES NOT ELIMINATE THE NEED FOR AN AUTOMOBILE INSURANCE POLICY."

71.     Mr. Alkhatib questioned "John Figueroa" regarding the insurance disclaimer, as he had promised he would not have to purchase any other insurance.

72.     "John Figueroa", however, replied that that disclaimer only applied to the first six months, and after six months, it would transfer to complete coverage.

73.     "John Figueroa" also promised that Plaintiff would receive his insurance card in the mail.

74.     To date, Plaintiff has not received any insurance card in the mail, and has since purchased his own insurance.

75.     Mr. Alkhatib was also given a copy of the written mandatory Service Contract for which he was charged $3,000.

76.     The Service Contract indicated that the selling dealership was Planet Motor Cars at 16014 Hillside Avenue in Jamaica, NY.

77.     The Service Contract also indicated that the vehicle purchase price was $20,000.00.

78.     The Service Contract vendor was AUI Corp, 1250 Main Street, Suite 300 Napa, CA.

79.     On or about December 19, 2012 the Dealership or its agents or employees sent electronic messages by fax and/or emails and/or over the internet through use of Dealertrack software to COAF and/or other financial institutions regarding Mr. Alkhatib, the retail installment contract and other information in an attempt to assign the RIC and obtain payment for the agreement the Dealership had induced Mr. Alkhatib to enter into.

80.     Shortly after the transaction, Mr. Alkhatib contacted Technology Insurance Company, Inc., the provider for the "Theft Deterrent" protection listed on the policy, to attempt to cancel the insurance.

81.     Technology Insurance Company representatives, however, told Mr. Alkhatib that they had no record of him having a policy with them and could not assist him in cancellation.

82.     Thereafter, Mr. Alkhatib wrote to New York Motor Group requesting cancellation of the policy.

83.     To date he has not received any response from NY Motor Group.

84.     Mr. Alkhatib also attempted to cancel the Service Contract he was forced to purchase.

85.     Following the express instructions for cancellation listed on the contract, Mr. Alkhatib wrote to Planet Motor Cars, which is listed as the "selling dealer" on the contract, and requested cancellation, attaching a copy of the service contract.

86.     To date, Mr. Alkhatib has not received any contact from that or any other dealership regarding the cancellation of the service contract.

87.     After having put down $10,000 on the date of the initial transaction, Mr. Alkhatib has been making monthly payments to COAF towards pay off of a loan for $13,309.53 for the purchase of a vehicle advertised at $14,995.

88.     At all relevant times Defendants acted willfully and in bad faith.

89.     The unlawful actions described herein harmed Plaintiff.


**COUNT I**
**TRUTH IN LENDING ACT, 15 §§1601 et seq. ("TILA")**
**(Against NYMG, Planet Motor Cars, and COAF only)**

90.     Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

91.     Plaintiff's transaction as described herein was a consumer credit transaction within the meaning of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

92.     Defendants are creditors within the meaning of TILA and Regulation Z.

93.     The increase in the cash price of the vehicle from the originally confirmed price of $13,995 is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

94.     The cash price increase of over $7,450 is attributable to items and charges that Plaintiff was required to pay incident to the extension of credit to Plaintiff, and is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

95.     As a result of Defendants' failure to properly include these and/or other fees and charges as finance charges, the sale price, finance charge, amount financed, and APR disclosed in Plaintiff's RIC are all materially misstated, in violation of TILA and Regulation Z. e.g. § 1638(a)(2) through (5) and §226.18(b), (d), (e), and (h).

11

96.     Defendants have failed to provide Plaintiff with clear and conspicuous disclosures of the terms of the loan as required under TILA and Regulation Z.  e.g. 15 U.S.C. § 1632(a), § 1638(a), and Regulation Z, e.g. 12 C.F.R. § 226.17(a)(1).

97.     As a result of Defendants' incomplete, inaccurate, and materially misstated disclosures, Plaintiff has suffered actual damages, including but not limited to the over $7,450 in extras that Plaintiff did not want or need but was required to purchase as a condition of receiving financing.

98.     Had Defendants provided complete and accurate disclosure of all terms, costs, finance charges and interest rates, Plaintiff would not have agreed to purchase the vehicle on the terms and conditions imposed on him by the Defendants and instead would have sought to purchase a vehicle without the unwanted and unnecessary warranties and additional charges imposed on him by the Defendants.

99.     Additionally, had Defendants provided complete and accurate disclosure of all terms, costs, finance charges and interest rates, Plaintiff would have sought and obtained alternate, lower cost financing.

100.    For all these reasons, Defendants are liable under TILA and Regulation Z (see, e.g. 15 U.S.C. §§ 1640 and 1641) for statutory damages, actual damages, attorney's fees, litigation expenses and costs, for a declaratory judgment that they have violated TILA and Regulation Z, and for such other or further relief as the Court deems appropriate.

## COUNT II
### CIVIL VIOLATIONS OF RICO, 28 U.S.C. § 1692(c) & (d)

101.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

102.    Plaintiff is a natural person, and as such is a "person" within the meaning of 18 U.S.C. § 1961(3).

103.    Defendants are natural persons and legal entities, and as such are "persons" within the meaning of 18 USC § 1961(3).

104.    On information and belief, the Dealerships, Mamdoh Eltouby, Nada Eltouby, and Julio Estrada (collectively "the Enterprise Defendants") comprise distinct groups of persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4).  Each and every one of these defendants is employed by or associated with the enterprise.

105.     On information and belief, the Dealership, Mamdoh Eltouby, Nada Eltouby, and Julio Estrada also qualify as separate and distinct enterprises within the meaning of 18 U.S.C. § 1961(4).  Each and every one of these defendants is employed by or associated with the Dealerships.

106.    On information and belief these individuals and entities taken together are an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

107.    The purpose of the enterprise and/or enterprises (collectively "Enterprise") is to secure payments from financial institutions by assigning Motor Vehicle Retail Installment Contracts that were obtained through fraudulent means used to inflate advertised prices and place consumers in larger debt obligations.  The relationships between the Enterprise Defendants are longstanding and ongoing.

108.    The Enterprise has been ongoing for at least one year and engaged in and continues to engage in activites that affect interstate commerce.  The Enterprise in violation of RICO has been and remains longstanding, continuous and open ended.

109.    The Enterprise Defendants, individually and collectively, as an Enterprise, have engaged directly or indirectly, in a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c) & (d).

110.    Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations. The scheme includes but is not limited to:

a)  Advertising sale prices for vehicles on the internet and elsewhere that appear to be discounted and in some instances deeply discounted for thousands of dollars under market value in an effort to lure more consumers to the Dealership;

b)  Preparing Retail Installment Contracts for the sale of motor vehicles that then inflate the price of the vehicles by falsely telling consumers that they are required to purchase additional products such as service contracts, warranties, and insurance policies in order to obtain financing;

c)  Obtaining payments from or on behalf of consumers for promised insurance policies that are not real or are not created for the consumers as promised;

d)  Preparing service contracts and theft deterrent product protection forms in order to induce payments from or on behalf of consumers when in fact, no service contract or product protection policy is actually put in place for the consumer;

e)  Inducing consumers to enter into loan obligations with higher than necessary payments, higher than advertised prices, and the inclusion of unnecessary and/or non-existent additional products with the false promise that consumers may return to the Dealership within 4-8 months to refinance the loans and receive significantly reduced interest and monthly payment obligations; and

f)  Obtain payments from consumers by promising to arrange refinancing with banks or credit unions on more favorable terms without having any intention and without making any effort to actually arrange the refinancing.

14

111.    The Enterprise Defendants, acting individually and as part of the Enterprise have made fraudulent misrepresentations on specific occasions as follows:

a)  On December 19, 2012; December 27, 2012, February 19, 2013 Defendants conveyed to consumers, including Plaintiff herein, that they were required to purchase service contracts and or insurance policies in order to obtain financing through the Dealerships assignee's when that was not true and in fact, they are prohibited from requiring the purchase of additional products beyond the subject vehicle when arranging financing.

b)  On December 27, 2012 and February 19, 2013 Defendants obtained payments from consumers Boris Freire and Simon Gabrys, respectively, with the false promise that the consumer could return to the Dealership in 4-8 months to refinance their loans at more favorable terms.

c)  On December 27, 2012, January 3, 2013, February 19, 2013, July 17, 2013 and August 16, 2013 Defendant Estrada promised to arrange to refinance consumers loans, with Bank of America and/or People's Credit Union and/or other financial institutions, when it was not possible or when Defendants had no intention of doing so.

d)  On August 16, 2013, Defendants obtained a payment from consumers Borris Freire and Miriam Osorio with the false promise to refinance the consumer's loan with Bank of America when it was not possible or when Defendants had no intention of doing so.

15

112.   Enterprise Defendants acting individually and as part of the Enterprise, have used the

wires and have caused the wires to be used, or reasonably knew the wires would be used, in

furtherance of their fraudulent scheme.  Specifically:

    a)   In December 2012 and February 2013 the Enterprise Defendants used the internet

to advertise prices for vehicles on websites including cars.com; autotrader.com,

and newyorkmotorgroup.com that listed prices that appeared discounted, in some

instances deeply so, but in actuality were only listed in order to lure consumers to

the dealership in order to then fraudulently place them in loan obligations with

drastically increased vehicle prices.

    b)   On or about December 19, 2012 Enterprise Defendants transmitted fraudulently

prepared documents, as described in detail here in ¶ 79, by fax and/or email

and/or other electronic means to lending institutions in order to obtain payments.

    c)   On or about December 27, 2012 Enterprise Defendants, as part of the Enterprise

described herein, transmitted fraudulently prepared documents, including but not

limited to a retail installment contract,  regarding Consumer Simon Gabrys'

purchase and finance of a vehicle by fax and/or email and/or other electronic

means to lending institutions in order to obtain payments.

    d)   On or about February 19, 2013 Enterprise Defendants, as part of the Enterprise

described herein, transmitted fraudulently prepared documents, including but not

limited to a retail installment contract,  regarding Consumer Boris Fereire's

purchase and finance of a vehicle by fax and/or email and/or other electronic

means to lending institutions in order to obtain payments.

e)   On October 7, 2013 Enterprise Defendants transmitted documents by fax that they

required consumer Simon Gabrys to produce in furtherance of a fraudulent

refinancing scheme as part of this Enterprise.

113.   Defendants have used the wires in connection with every fraudulently induced retail

installment contract they have obtained, and each use of the wires has furthered the

fraudulent scheme and enabled Defendants to take money and property from Plaintiff and

other consumers by means of false pretenses and representations.

114.   On information and belief, each and every defendant has specific knowledge that the

wires are being utilized in furtherance of the overall purpose of executing the scheme to

defraud, and/or it was reasonably foreseeable that the wires would be used because the

Dealerships' business model relies on faxes and electronic communications with financial

institution assignees and others in order to obtain payments.  Indeed, the dealership relies on

the electronic communication system of DealerTrack, Inc. in order to have quick

communication with financial institutions to assign and receive payments on the loans it

creates with consumers.

115.   Each of the uses of the wires in connection with Defendants' schemes to defraud in the

past year constitutes a separate instance of wire fraud within the meaning of 18 U.S.C. §

1341 and 1343, and thus is also a predicate act, which taken together, constitute "a pattern of

racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

116.   In connection with Defendants' schemes, the acts of racketeering activity have occurred

after the effective date of the RICO statute, 18 U.S.C. § 1961 *et seq.,* and on countless

occasions over a substantial time period within ten years of each other. The acts of

17

racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been and will be repeated.

117.    As described here, the goal of the Enterprise is to obtain larger payments from or on behalf of consumers through the use of fraudulent means such as false promises of refinancing or the "requirement" of unnecessary or bogus products.

118.    The pattern of racketeering activity described above is integral to the Enterprise Defendants' scheme.  Without engaging in wire fraud, Defendants would be unable to obtain the larger payments they seek.

119.    Each Enterprise Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above.  Accordingly, each defendant has violated 18 USC § 1962(c).

120.    Moreover, each Enterprise Defendant, has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including the numerous predicate acts of mail and wire fraud described above, and has thus violated 18 U.S.C. § 1962(d).

121.    As a direct and proximate result of the RICO violations described in this Amended Complaint, Plaintiff and other consumers have suffered substantial injuries. Plaintiff has had money extracted from him, been obligated to a larger financial burden than originally promised, made payments for products that were promised by never provided, and has incurred costs that he was promised he would not have to incur (e.g. the continued payment for insurance coverage outside of the RIC), thus constituting an injury to Plaintiffs' property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants and their co-conspirators in violation of 18 U.S.c. § 1 962(c) & (d).

122.    Defendants' conduct has involved and continues to pose a threat of long term criminality since it is believed to have commenced over a year ago and has continued to the present. The pattern of racketeering activity has been directed towards hundreds, if not thousands, of consumers, including Plaintiffs.

123.    For the violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiffs are entitled to recover compensatory and treble damages in an amount to be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future.

**COUNT III**
**VIOLATIONS OF NEW YORK MOTOR VEHICLE**
**RETAIL INSTALLMENT SALES ACT § 302, et seq. (MVRISA)**

124.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

125.    The Plaintiff is a "retail buyer" within the meaning of MVRISA § 301(2).

126.    The Dealership is a "retailer seller" within the meaning of MVRISA § 301(3).

127.    The transaction as described above was a "retail instalment sale" within the meaning of MVRISA § 301(4).

128.    Under MVRISA § 302(1) a motor vehicle retail installment contract shall contain all of the agreements between the parties.

129.    Under MVRISA § 302(5) a retail installment contract shall also contain any amount included for insurance, "specifying and describing the coverage and the amount included for each type of coverage."

130.    The RIC here did not contain all of the agreements between the parties.  To wit:  the RIC did not indicate that as part of the purchase price, Plaintiff was paying for a promised service contract and vehicle insurance and instead merely lists an inflated purchase price.

131.   Accordingly the Dealerships violated MVRISA § 302(1) by providing a retail installment contract that did not contain all of the terms of the agreement.

132.   Moreover Plaintiff was charged for insurance coverage but this charge and a description of the coverage was not detailed in the RIC as required.

133.   Accordingly, the dealership violated MVRISA § 302(5) by providing a retail installment contract that did not include the amount paid for insurance coverage or specify and describe the coverage.

134.   Finally, under MVRISA § 302(5) the RIC must comply with all disclosure requirements under TILA.  As described above the RIC does not comply with TILA and thus also violates MVRISA for failing to properly disclose finance charges.

135.   For all of the reasons stated herein, under MVRISA § 307, Defendants are barred from recovering any credit service charge, delinquency, or collection charge on the RIC.

## COUNT IV
## VIOLATION OF NEW YORK CIVIL USURY LAWS

136.   Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

137.   Pursuant to General Obligations Law § 5-501, the legal rate of interest in New York is "six per centum per annum unless a different rate is prescribed in §14-a of the Banking Law." Section 14-a (1) provides: "The maximum rate of interest provided for in section 5-501 of the general obligations law shall be sixteen per centum per annum."

138.   The Dealership is not a "national banking association," and therefore is not exempt from state usury laws under 12 U.S.C. §85.

139.   The Dealership has obscured the actual rate of interest charged and the total amount financed by hiding additional interest as costs within the purchase.

140.    In reality, the increase in the cash price of the vehicle and/or the cost of the additional mandatory products and charges are finance charges that should have been disclosed as such in the contract.

141.    When these charges are added to the incomplete finance charge, the total finance charge is actually over $7,450 higher than reported, and the interest rate for this loan is well over 16%.

142.    Pursuant to NYGOL § 5-501, the alleged interest is therefore usurious, and the creditor forfeits both principal and interest due on the transaction.

143.    As a result of Defendants' violations, Plaintiffs are entitled to a declaratory judgment that their obligation to COAF, the assignee of the loan made by the Dealership, is void, and are entitled to damages in the amount of all principal, interest, fees and other charges paid on the auto loan to date.

## COUNT V
## FRAUD

144.    Plaintiff re-alleges and incorporates by reference the foregoing paragraphs.

145.    Defendants intentionally and fraudulently induced Plaintiff to enter into a retail installment contract requiring Plaintiff to borrow more than $7,450 than was originally agreed with the false representation that the vehicle could only be purchased and financed if Plaintiff purchased additional products required by the lender.

146.    Plaintiff justifiably relied upon each of Defendants' misrepresentations of material facts, as a result of which he sustained losses and damages.

147.    Had Plaintiff not been misled by Defendants, he never would have agreed to a vehicle purchase transaction obligating him to pay off a vehicle purchase cost that is more than $7,450 higher than agreed.

148.    As a result of Plaintiff's reasonable reliance upon Defendants misrepresentations,

Plaintiff has been damaged in an amount to be determined at trial and is entitled to actual and

punitive damages, attorneys fees, and costs and expenses.

## COUNT VI
### NYGBL § 350 (Unlawful False Advertising)

149.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

150.    Each of the acts and practices set forth above,  also constitute violations of NYGBL §

350,  which makes false advertising unlawful, independent of whether these acts and practices

constitute violations of any other law.

151.    This false advertising was committed in the conduct of business, trade, commerce or the

furnishing of a service in this state.

152.     Under NYGBL § 350, "false advertising" means "advertising, including labeling, of a

commodity . . . if such advertising is misleading in a material respect. In determining whether

any advertising is misleading, there shall be taken into account (among other things) not only

representations made by statement, word, design, device, sound or any combination thereof, but

also the extent to which the advertising fails to reveal facts material in the light of such

representations with respect to the commodity . . . to which the advertising relates under the

conditions prescribed in said advertisement, or under such conditions as are customary or usual."

153.     The Vehicle was advertised on www.cars .com for $14,995.  And at the Dealership, the

vehicle had a sticker price of $16,995.  This online ad and the sticker price on the vehicle are

"advertising," as defined by NYGBL§ 350.

154.    Specifically, Defendants falsely advertised the vehicle's price because they hid the true

cost to the consumer of purchasing the car. Defendants did so by increasing the sales price of the

vehicle from the amount advertised by adding "mandatory" products, charges, and service contracts.

155.    Defendants' placing an online ad with a listed price of $14,995 and placing a sticker price on the vehicle showing a price of $16,995, followed by a false negotiation in which Defendant represented to Plaintiff that the sale price would be reduced from $16,995 to the "bargain" price of $13,995, then followed by insisting that certain warranties and service contracts had to be purchased for thousands of dollars over and above the stated price in order to obtain financing, taken together, represent the Defendants' false advertising.

156.    Defendants' false advertising was done knowingly and willfully and committed in bad faith.

157.    As a result of Defendants' false advertising in violation of NYGBL § 350, Plaintiff suffered actual damages including but not limited to the cost of the warranties, "insurance," "processing fees," and service contracts that were not included in the advertised price but he was forced to purchase.

158.    For these reasons, Plaintiff is entitled to injunctive relief (enjoining the false advertising practices described above), actual damages, three times the actual damages up to $10,000, costs and reasonable attorneys fees pursuant to NYGBL § 350-e.

**COUNT VII**
**NYGBL § 349 (Deceptive Acts and Practices Unlawful)**

159.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

160.    Defendants acts and practices set forth above, also constitute violations of NYGBL § 349, which makes deceptive acts in the conduct of business, trade, commerce or the furnishing of a service in this state, unlawful, independent of whether these acts and practices constitute violations of any other law.

161.   These deceptive acts and practices were committed in conduct of business, trade, commerce or the furnishing of a service in this state.

162.   Each of these actions was consumer oriented and involves misleading conduct that is recurring and has a broad impact upon the public, or, in the alternative, such misleading practices are the types that could easily recur, could potentially impact similarly situated consumers, and are therefore consumer-oriented and harmful to the public at large.

163.   Upon information and belief, the Dealership routinely induces customers to purchase warranties and service contracts and insurance products by falsely representing that such purchases are required by the banks and finance companies to which the subject loans will be assigned. For example, in addition to inducing Plaintiff here to purchase a service contract and insurance falsely described as "required" for financing, Defendants made similar false representations to consumer Simon Gabrys to induce him to purchase a service contract and insurance on December 27, 2012 and to consumers Boris Freire and Miriam Osorio for the same reason on February 19, 2013.

164.   Upon information and belief, these false and deceptive consumer oriented actions result in all Defendants receiving payments from the transaction that are higher than if the false and deceptive actions were not employed.

165.   Defendants' conduct and statements were materially misleading.

166.   As a result of these violations of NYGBL §349, Plaintiff suffered pecuniary and non-pecuniary harm.

167.   Upon information and belief, Defendants' violations were willful and knowing and committed in bad faith.

168.    For these reasons, Plaintiff is entitled to actual damages, three times the actual damages up to $1000, costs and reasonable attorneys fees pursuant to NYGBL § 349(h), and declaratory judgment that Defendants' practices are deceptive as defined under § 349.

## COUNT VIII
## RESCISSION/MISTAKE

169.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

170.    As alleged herein (see Count of Fraud, *supra*) Defendants have committed fraudulent acts and made fraudulent representations to Plaintiff.

171.    Based on Defendants fraud and misrepresentations, Plaintiff's execution of the Retail Installment Contract is founded upon material mistake.

172.    As a result of Defendants' fraud and misrepresentations and Plaintiff's resulting material mistake, Plaintiff has sustained damages.

173.    Because Plaintiff has consistently sought to resolve this dispute and receive a refund of all charges that were not disclosed to him until after the sale, there can be no claim of laches.

174.    Plaintiff is ready, willing and able to restore the parties to the position each occupied prior to the execution of the subject agreements, providing that Defendants return all the money paid by Plaintiff in connection with this transaction and otherwise restore Plaintiff to the status quo ante.

175.    Plaintiff has no remedy at law.

176.    By reason of the foregoing, Plaintiff is entitled to a judgment rescinding and setting aside the Retail Installment Contract and Service Contract, and directing the return to them of all money paid in connection with this transaction.

## COUNT IX

**BREACH OF CONTRACT**

177.    Moreover, Defendants contracted with Plaintiff to provide insurance through the Dealership for $2,700 as under "Option 2" for financing the vehicle.

178.    The insurance policy turned out to be "Theft Deterrent" protection.

179.    After Plaintiff contacted Technology Insurance Company, Inc., the provider of the protection listed on the policy, to try and cancel the insurance, he was informed that they had no record of him having a policy with them, and could therefore not assist him in cancellation.

180.    Despite the failure to provide Plaintiff with the insurance policy he bargained for, Defendants have not responded to Plaintiff's requests for cancellation of the policy.

181.    Defendants have received the purchase price of the insurance policy and more, but Plaintiff has not received what he bargained for.

182.    As a result of Defendants failure to deliver what they promised in exchange for a payment for the "Theft Deterrent" protection that has been received and retained, Defendants have breached their contracts with Plaintiff.

183.    In addition, Plaintiff agreed to purchase the insurance on reliance of the Dealership's promise that he would not need to purchase any other insurance for the vehicle.

184.    Dealership promised that Plaintiff would receive his insurance card in the mail. To date, Plaintiff has not received an insurance card in the mail.

185.    Defendants have received the purchase price of the vehicle and more, but Plaintiff has not received what he bargained for and instead is obligated to pay for his own car insurance.

186.    As a result of Defendants failure to deliver what they promised in exchange for an "insurance" payment that has been received and retained, Defendants have breached their contracts with Plaintiff.

187.    As a result of Defendants' breach, Plaintiff has been damaged in the amount of more than $2,700 plus other amounts to be determined at trial, and is entitled to actual damages, attorneys fees, and costs and expenses.

## COUNT X
## NEGLIGENT HIRING, RETENTION, TRAINING, AND SUPERVISION

188.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

189.    The Dealership and Defendant Mamdoh Eltouby failed to exercise reasonable care in selecting, instructing and supervising the employees and/or agents it hired to sell motor vehicles and arrange vehicle purchase loans.

190.    The Dealership's and Mr. Eltouby's agents and employees acted willfully, unlawfully and in an intentionally fraudulent manner towards Plaintiff as set forth herein.

191.    Upon information and belief, at all times Defendants Julio Estrada and Nada Eltouby were subject to the Dearelship's and Mr. Eltouby's direct supervision and control.

192.    The Dealership and Mr. Eltouby knew or should have known of the other Defendants' propensity to commit the unlawful acts described herein or should have known of such propensity had they conducted an adequate hiring procedure.

193.    The Dealership and Mr. Eltouby do not properly train or supervise the employees and/or agents they use to sell vehicles and arrange for vehicle financing.

194.    Indeed, upon information and belief, the Dealership and Mr. Eltouby train their employees and/or agents to violate state and federal consumer and other laws.

195.    The Dealership and Mr. Eltouby owed a duty of care to Plaintiff that its employees and agents would act in accordance with state and federal laws.

196.    As a direct result and proximate cause of the Dealership's and Mr. Eltouby's employees and/or agents' unreasonable, unfair, illegal and fruadulent conduct, Mr. Alkhatib has suffered

harm including, without limitation, the damages set forth in Counts I-IX, above.

197.   As a result of the foregoing, Mr. Alkhatib is entitled to actual and punitive damages, and

reasonable costs.

WHEREFORE Plaintiff respectfully demands judgment against Defendants as follows:

a. On COUNT I, TRUTH IN LENDING ACT, 15 §§1601 et seq. ("TILA"), judgment against Defendants for statutory damages, actual damages, attorney's fees, litigation expenses and costs, declaratory judgment that they have violated TILA and Regulation Z, and such other or further relief as the Court deems appropriate:

b. On COUNT II, VIOLATIONS OF RICO, judgment against Defendants for compensatory and treble damages in an amount to be determined at trial, and a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future;

c. On COUNT III, VIOLATIONS OF MVRISA, declaratory judgment against Defendants that they have violated MVRISA and ordering the cancellation of the RIC and restitution of all funds paid under the RIC.

d. On COUNT IV, VIOLATIONS OF NEW YORK CIVIL USURY LAWS, declaratory judgment that Plaintiffs' obligation to COAF, the assignee of the loan made by Defendants, is void, actual damages in the amount of all principal, interest, fees, and charges paid and such other and further relief as the Court deems appropriate;

e. On COUNT V, FRAUD, judgment against Defendants, actual damages, punitive damages, costs and reasonable attorneys fees;

f. On COUNT VI, NYGBL § 350, judgment against Defendants, injunctive relief, actual damages, three times the actual damages up to $10,000, costs and reasonable attorneys fees pursuant to NYGBL § 350(e), declaratory judgment that Defendants' have engaged in false advertising and such other or further relief as the Court deems appropriate;

g. On COUNT VII, NYGBL § 349, judgment against Defendants, injunctive relief, actual damages, three times the actual damage up to $1,000, costs and reasonable attorneys fees pursuant to NYGBL § 349(h), declaratory judgment that Defendants have violated NYGBL § 349 and such other and further relief as the Court deems appropriate;

h. On COUNT VIII RESCISSION/MISTAKE, judgment rescinding and setting aside the Retail Installment Contract and service contract, and directing the return to Plaintiff of all money paid in connection with this transaction;

i. On COUNT IX BREACH OF CONTRACT, judgment against Defendants, actual damages, costs and reasonable attorneys fees;

j. On Count X NEGLIGENT HIRING RETENTION AND TRAINING, judgment against Defendants for actual damages, punitive damages and reasonable costs.

k. Such other and further relief as law or equity may provide.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated: March 12, 2014
     New York, New York

               Respectfully Submitted,

               Peter T. Lane, Esq.
               Schlanger & Schlanger, LLP
               *Attorneys for Plaintiff*
               9 East 40th Street, Suite 1300
               New York, NY 10016
               Ph: 914-946-1981, ext. 109
               peter.lane@schlangerlegal.com